UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-05-55-B-W |
| | ) | |
| BRIAN N. MARLES | ) | |

**ORDER ON GOVERNMENT'S REQUEST
FOR A U.S.S.G. § 3B1.3 ENHANCEMENT**

This Court concludes that Brian N. Marles, a former Senior Credit Analyst who worked for MBNA, a credit card company, did not abuse a position of trust or use a special skill within the meaning of U.S.S.G. § 3B1.3 when he defrauded his employer in violation of federal criminal law.

**I. Statement of Facts**

Brian N. Marles, a former Senior Credit Analyst who worked for MBNA, a credit card company, accessed his personal account at MBNA through knowledge and skill he gained as an employee and fraudulently increased his own line of credit for the purpose of improperly transferring balances from his high interest rate credit cards issued by other banks into his MBNA account at a favorable interest rate. In so doing, he breached his employer's trust, used special skills, and violated federal criminal law. On July 18, 2005, he pleaded guilty to committing fraud in connection with a computer, a violation of 18 U.S.C. § 1030. (Docket # 6). In the PreSentence Investigation Report, the Probation Office recommended against a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust or use of a special skill in carrying out or concealing the offense. The Government objected and, on November 29 and December 1, 2005, this Court received evidence on whether § 3B1.3 should be applied.

**A. MBNA: The Holding Company**

MBNA is a bank holding company headquartered in Wilmington, Delaware.  It has about 27,000 employees worldwide and a significant presence in Maine.  It focuses on the issuance of credit cards and specializes in so-called affinity cards, those branded with the name of a charity or business, typically each use resulting in a small donation to the charity or financial benefit to the cardholder.  It has been extremely successful.

Although often issued by banks, the credit card business has some, but not all of the attributes of traditional banking.  Unlike bank loans, which are typically collateralized, an extension of credit to a cardholder is wholly unsecured.  It may be true that credit extensions are generally only as good as the person's willingness and ability to pay, but this precept applies with special force to the credit card business.  Without a home to foreclose on or a car to repossess, once a credit card company extends a personal line of credit, the person can immediately access the money and, if the person fails or refuses to repay, the credit card company has a problem.  One would think this fact of business life would influence credit card lenders to be conservative in the extension of credit.

However, the credit card world is highly competitive and many customers have a wide range of potential credit card companies willing in varying degrees to extend new lines of credit or to accept balance transfers.  Unlike more traditional banking, the credit analyst is unlikely to know or ever meet the customer, and he or she makes the credit extension decision typically within minutes during a brief telephone conversation.

For some credit card companies, whether to extend credit is more a matter of numbers than judgment.  Using a system developed by Fair Isaac & Co., called a FICO score, virtually all commercial lenders numerically grade a potential borrower's creditworthiness, based on factors ranging from the history of late payments to the length of time at the current residence.  Some

lenders use the FICO score exclusively; if the score is high enough, the borrower gets the credit; if not, he or she does not. MBNA approaches the extension of credit somewhat differently. It uses the FICO score as a guide, but does not bind the credit analyst. Instead, each application is viewed individually and the credit analyst is expected to apply his or her judgment to the lending decision. MBNA has found that a more individualized approach provides greater flexibility on lending. As a consequence, MBNA relies more heavily on the judgment of its credit analysts and gives them a wider range of authority and discretion than other credit card companies.

MBNA has two general types of loan processes: applications under queue and personal phone calls. "Under queue" applications are documented credit applications, such as written or on-line applications, which the computer places in a priority list and the Senior Credit Analysts are called on to act on them. Generally, applications under queue can be completed more quickly than personal phone calls, a range of 15 to 22 per hour or 150 to 160 decisions per day. Direct phone calls with customers take longer and Senior Credit Analysts are expected to make between 12 and 15 decisions per hour or 60 to 80 per day. Depending on the type of process, a Senior Credit Analyst takes between 45 seconds and 1 minute on a queue application and 2 to 3 minutes on a personal phone call to decide whether to extend credit.

**B.  Brian N. Marles**

Brian N. Marles, a thirty-eight year old resident of Shapleigh, Maine, is a veteran of the United States Marine Corps and a graduate of the University of Southern Maine (USM). Mr. Marles began employment at MBNA in Customer Assistance as an Account Manager on June 17, 1996. While in the Marine Corps, Mr. Marles rose to the rank of E4 and received Good Conduct and National Defense Medals, two letters of appreciation, two Meritorious Masts, the Marine Corps Expeditionary Medal, and a Sea Service Deployment ribbon. Following an

Honorable Discharge on May 23, 1992, he entered USM and received a bachelor degree in business administration in 1997.

On November 29, 1997, Mr. Marles moved from Customer Assistance to the Credit Division, starting as a Credit Analyst II. MBNA extended loan authority to him of $5,500.00. Loan authority refers to the amount of credit an employee can extend without direct supervisory oversight or approval and the extension of loan authority is a mark of some distinction at MBNA, reflecting the company's view of the employee's judgment and competence. Each employee granted loan authority is assigned a lender code, which follows him or her throughout the person's career at MBNA. Each time a loan is approved, the employee's lender code attaches internally to the customer's account, allowing MBNA to track and evaluate the employee's decision.

Mr. Marles rose in the Credit Department and as he did, his title and loan authority rose. In the fall of 1998, Mr. Marles applied for and received a promotion to Senior Credit Analyst, a competitive position within MBNA. The company does not hire Senior Credit Analysts externally and there are typically 2 or 3 internal applicants for each position. The job qualifications include a minimum of nine months prior customer contact experience at MBNA or elsewhere, strong analytic skills, knowledge of MBNA policies and procedures, and a minimum of one year previous external lending experience. A four-year college degree is preferred.

Successful candidates undergo a six week education process of "very intense" training on such topics as security, ethics, analysis of credit reports, and the use of confidential information. Each credit department employee's loan authority starts at $5,500.00 and gradually, as the employee gains experience and competence, is increased in step gradations. Mr. Marles started out as a Credit Analyst II, Grade 219. By January 2005, when Mr. Marles committed this crime,

he had been promoted to Senior Credit Analyst, Grade 220 and his loan authority had reached the peak for his position: $25,000.00. Of its approximately 27,000 employees, MBNA employs about 1,000 credit analysts and about 200 to 220 work in the Belfast office.

As a Senior Credit Analyst, Mr. Marles had to possess a number of talents. He had to be highly computer literate, able to navigate Lexis/Nexis, MBNA's internal software, and the Internet. He had to be aware of MBNA's lending policies and philosophy. Mr. Marles made numerous loan decisions during telephone conversations with applicants, requiring adeptness at obtaining and analyzing information such as credit reports, employment histories, demographics, income, debt, disposable income, and payment history with a view toward rendering a quick, but accurate judgment on the applicant's ability, stability, and willingness to pay. Mr. Marles' job required him to be on the phone or on the computer his entire shift and he made between 60 and 160 decisions each day. Mr. Marles was required to be aware of MBNA marketing strategies and was expected to implement them in his discussions with customers. By all accounts, Mr. Marles was a good Senior Credit Analyst. He was paid well by MBNA, earning approximately $50,000 each of the last two years he worked there.

### C.  Mr. Marles and Discretion

As a Senior Credit Analyst, Mr. Marles had the initial discretion to make the vast majority of credit decisions. His direct supervisor reviewed only about 10% of his lending decisions and over the course of the year, Mr. Marles committed MBNA to lending literally millions and millions of dollars. One estimate was that in an average year a Senior Credit Analyst like Mr. Marles at MBNA could authorize the lending of as much as $100,000,000.00. If within his lending authority, once Mr. Marles approved the credit and entered it into the

MBNA computer, the customer could at that moment, if so inclined, withdraw the full amount of the money and walk away with it – unsecured.

On the other hand, Mr. Marles acted within tight constraints.  He was required to generate sufficient information to plug in necessary credit factors to satisfy MBNA criteria.  Although he enjoyed some ability to explore alternative means for assessing risk, if he did so, he would have been required to fully document his departure.  Once he understood the credit parameters, his job of Senior Credit Analyst became at the same time repetitive and intense, because MBNA continuously evaluated his performance for documentation and efficiency, based on predetermined criteria.

Mr. Marles was not a manager and did not supervise other employees.  MBNA is organized in numerical classifications.   The entry-level classification is 214 and the classifications ranging from 214 to 221 are denominated "representatives," and are deemed non-managerial – non-exempt employees.   Like most corporations, MBNA has a pyramidical employment structure with representatives forming the base of the pyramid; unit or section managers forming the next smaller section; department managers forming the next even smaller section; and, directors, usually located at the head office in Delaware, forming the smallest section at the apex.  At the end of his employment, Mr. Marles' classification remained 220, within the base of the employment pyramid.  By virtue of his position, Mr. Marles had a password, which allowed access to MBNA's customer credit records, although everywhere he went by computer – whether he knew it or not - he left computer-generated fingerprints.

### D.  Big Brother and the Holding Company

Virtually everything Mr. Marles did as an MBNA employee could be tracked and analyzed.  Supervision could be overt.  When he began in credit, his immediate supervisor

performed "side-by-sides," literally sitting next to him as he performed his job and listening into his conversations with customers.  Even toward the end of his employment, his supervisor periodically listened into his telephone calls without his express knowledge.  Although Mr. Marles' supervisor testified that he rarely did so, this was in part because he had stationed Mr. Marles directly outside his office, so that he could overhear what Mr. Marles was saying to customers.[1]  He was, however, periodically subjected to taped calls where, unknown to him, a call would be taped to be played back and later analyzed by a group of managers.

Further, between 5% and 10% of Mr. Marles' decisions were subjected to random managerial review every month.  The manager would perform a "product sampling" and grade his performance against a set of criteria and against the performance of similarly-situated employees.  The criteria would include the quality of his decision; the accuracy of the information – such as customer name and address; the efficiency of his decisionmaking – such as the number of decisions per hour; and the number of balance transfers he achieved.

MBNA also had impressive ability to subject Mr. Marles' workday to microscopic analysis.  This could result from personal observation by his superiors; for example, this entry appears in Mr. Marles' personnel file for November 23, 2003:

> Note to file from Matt Porter as his manager observed Brian at 7:00 pm utilizing the Internet to view pictures of motorcycles.  This was not part of Brian's approved break time.  Brian was assisting with CLM volume and Matt Porter noted that calls were holding.

---

[1] Mr. Marles' supervisor explained that Mr. Marles had something of a history of "saying things without thinking them through."  He described Mr. Marles as requiring additional supervision and being difficult to manage.  The personnel file reflects that he called one customer a "loser" and another a "retard."  This unfortunate use of language extended to the workplace.  He asked a peer who was nursing, "Don't you have some milking to do?"  Although his lending decisions were well done, his relations with customers "needed a lot of extra work."  Hence, his supervisor placed Mr. Marles directly outside his office, so that he could monitor his conversations.

It could also result from a combination of personal oversight and computer generated analysis. For example, during the summer of 2004, the following entries appear in Mr. Marles' employment file:

7/16/04:    Brian did not assess the balance transfer fee [on an account].  I pulled up the CIBT window and we both agreed that the account was eligible for the fee.  I asked Brian why he did not assess the fee and he replied, "Old habits, I guess."  I asked him to expound on that.  Brian stated, "A long time ago I did not charge balance transfer fees.  I guess I forgot."  I told him that I didn't believe he forgot, that it was a choice he did not assess the fee.

7/20/04:    Brian's schedule is 12:00 pm – 9:00 pm.  His first designated break is at 2:00 pm. Brian was observed by his manager logging out of the phone at 12:45 pm and logging back in at 12:53 pm.  Brian came back to his desk with a sandwich from the café.  Brian was asked why he had gone to the café to obtain a sandwich when it was not his designated break time and previously he had been educated to go to the café only on his designated lunch or break times.  Brian stated, "I was hungry."

8/3/04:     Brian logged into the phone at 12:12 pm.  I walked around at 12:14 to ensure everyone was logged into the phone.  Brian stated it "takes 20 minutes to log into the phone."  I said, "especially when you are eating your lunch and not being RTS at the start of your shift."  Brian stated, "That has nothing to do with it."  Brian is being marked as tardy on August 3, 2004.

9/21/04:    During [a] taped call [listening session], Brian advised the applicant she was approved with a credit line of $7,500, yet he documented [that] he told her [she was] approved for $5,000 and ended [up] approving the application for a $5,000 credit line.  I asked him why I continue to listen and see examples of him communicating a specific decision or credit line to the applicant but doing something different.  Brian stated, "I don't know.  Brain cramp."  I told him that answer wasn't sufficient and I don't believe it and I want to know why this continues to happen.  Brian stated, "I told you."   Again, I reiterated that his quality is a choice and he is choosing not to implement feedback.  I told him that I am not threatening him, but he may find himself removed from the department based on decisions he is making.

9/24/04:    I met w/ Brian about his pending and why he had all approvals on Friday 9/24 . . . .

Finally, the MBNA computer system provided detailed quantitative analysis.  MBNA's system is capable of generating significant amounts of data on what its employees are doing at

work and of slicing this information in myriad ways.  For example, his personnel file contains a page in which a supervisor annotated with comments and question marks each time Mr. Marles logged in and out of his computer during the entire day on March 29, 2004.  His personnel file also contains sheets in which Mr. Marles' time on the computer was analyzed virtually second-by-second to assess his productivity.  These analyses considered how long Mr. Marles spent on each call; whether he approved or disapproved credit during the call; how much credit he extended; and, how his productivity compared with others in his classification in Belfast and elsewhere in the company.  Certain matters of interest could be called up, such as whether Mr. Marles documented evidence of prior bankruptcy filings, and his rate of documentation for this item would be compared with the database of all other Senior Credit Analysts at MBNA.

To evaluate Mr. Marles' performance, MBNA selected performance factors, such as quality and accuracy, application management, communication, problem solving, and time away from work, assigned a percentage of importance, quantified performance factors, and arrived at a numerical score for "overall performance rating" to the decimal.  Mr. Marles' ratings varied, for example, between 3.29 and 3.02.  These performance factors could themselves be dissected and compared.  In one sheet, his accuracy was rated on a scale of 100.00 for each month of the preceding year and compared against normative standards to arrive at his accuracy as a percent of standard.  MBNA was able to determine whether his accuracy was improving, declining, or remaining steady by month-to-month comparison.

Nothing, of course, is wrong with MBNA's close monitoring of its employees and their performance.  Each employee signs privacy waivers at the outset of employment and MBNA's ability to perform intensive quantitative analyses of its employees' productivity has no doubt led to identification and improvement of areas of individual weakness, which MBNA terms

"opportunities."  Presumably, such reviews are powerful tools for enhancing efficiency, ensuring customer satisfaction, and improving performance and may help explain its notable success in a highly competitive business.   They also, however, provide an unusual degree of contemporaneous and post hoc monitoring of the activities of employees like Mr. Marles.

### E.  Crime and Discovery

On January 13, 2005, Mr. Marles in his capacity as a Senior Credit Analyst, accessed credit card accounts assigned to himself and his wife.  Using MBNA computers, he accessed these personal accounts with his User ID and increased his own credit line from $19,300.00 to $45,000.00 and his wife's credit line from $2,000.00 to $5,000.00.  The total unauthorized credit increase was $28,700.00.  Later that evening, he used a telephone to pay off and transfer balances from two other credit card companies to his and his wife's MBNA accounts, totaling $20,628.00.  By the time it was discovered, the total amount charged on the credit line increases was $23,684.00.

MBNA discovered the transactions during routine audit on February 11, 2005.  Upon accessing his own and his wife's accounts, Mr. Marles left a computer fingerprint, reflecting this transaction.  The monthly report identified monetary and non-monetary transactions by MBNA employees to their own accounts and Mr. Marles' actions with his own and his wife's accounts came to light.  He was interviewed on February 14, 2005 and immediately confessed, admitting he knew MBNA would not have approved these credit increases.  He increased the credit limits on these MBNA accounts to take advantage of the lower MBNA interest rate of 8.9% and to avoid the higher rates charged by his other credit card companies.

### F.  Other MBNA Employees

The Government and the Defendant presented evidence of other MBNA employees who pleaded guilty to similar crimes; some did and some did not receive a § 3B1.3 enhancement. The employees included Sharon Lee and Jonathan Holland, who did not receive the enhancement, and Eric Price, who did.

This Court ruled on the Sharon Lee case and concluded an enhancement was not warranted. *United States v. Lee,* 324 F. Supp. 2d 165 (D. Me. 2004). Ms. Lee held the entry-level position of customer marketing advisor at MBNA. *Id.* at 166. She gained access to the accounts of customers with similar names and changed their addresses, issued new credit cards, and wrote checks on their accounts. *Id.* She was found out when she requested the direct deposit of funds into her account. *Id.* In denying the enhancement, this Court concluded her position was more like a bank teller than a bank executive and whatever special skills she possessed were similar to those of bank tellers. *Id.* at 167-68.

Jonathan Holland, an MBNA employee in the Delaware unit, occupied the same position as Mr. Marles: Senior Credit Analyst. During sentencing, Judge Sleet described Mr. Holland as occupying a position of trust, but did not apply the enhancement. Finally, in sentencing Eric Price, a Credit Analyst (one rung below Mr. Marles), Chief Judge Singal of this District found that he had abused his position of trust and increased his offense level pursuant to § 3B1.3. Mr. Price submitted fabricated applications and, like Ms. Lee, performed "account takeovers."

### G.  Senior Credit Analyst v. Bank Loan Officer

Finally, there is evidence comparing the positions of Senior Credit Analyst and Bank Loan Officer. Todd Beacham, a former Department Manager with MBNA, currently employed as a Regional Manager for Bank of America, testified based on his knowledge of both areas of business. He also acted as Mr. Marles' manager, organizationally above his immediate

11

supervisor.  Regarding bank loan officers, he said that a Senior Loan Officer, who might carry the title of Assistant Vice President or Vice President, would begin with lending authority of as much as $50,000.00 per loan and, over time, could gain lending authority as high as $500,000.00.  A Senior Loan Officer typically has the authority to commit the bank to make the loan, even if the underwriting department later disagrees; in Mr. Beacham's words, a "handshake is a done deal."

By contrast, Mr. Beacham testified that the Senior Credit Analyst does not necessarily have the last word.  An offer to extend credit can be countermanded by a superior and the Senior Credit Analyst can be required to call the customer back and renege.  In fact, he said that over the six years he had overseen him, Mr. Marles had been required to make call backs about one or two times every three to six months.  He said that the increasing levels of loan authority and enhanced job titles for credit analysts at MBNA are more nominal than real, because their actions are so closely monitored.

According to Mr. Beacham, the differences between the authority extended to bank loan officers and credit analysts are explained by a fundamental distinction between the ways they lend money.  Because banks almost always lend with security and credit card companies almost never do, this means that if the borrower fails to pay a bank, the consequences to the bank may be mitigated, but without security, a credit card company is exposed to greater risk of direct loss. Thus, once the bank officer complies with the bank's guidelines, he or she usually has the authority to commit the bank, but even if the credit analyst complies with the credit card company's guidelines, the decision is subject to review and contradiction.

## II.  Discussion

### A.  U.S.S.G. § 3B1.3:  Abuse of a Position of Trust or Use of a Special Skill

Section 3B1.3 of the United States Sentencing Guidelines provides in part:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels.

The Commentary explains that "[p]ublic or private trust refers to a position . . . characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3, cmt. n.1. The Commentary differentiates between a bank executive committing a fraudulent loan scheme, who would receive the enhancement, and a bank teller embezzling money, who would not.  *Id.*  For an abuse of trust enhancement to apply, the position of trust "must have contributed in some significant way to facilitating the commission or the concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)."  *Id.*  The Commentary defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  *Id.* at n.3.

### B.  Abuse of Trust

This Court cannot conclude that Mr. Marles occupied a position of trust at MBNA or used it to facilitate his offense within the meaning of U.S.S.G. § 3B1.3.  As the First Circuit explained in *United States v. Reccko,* the sentencing court must engage in a two-step inquiry:  (1) whether the defendant occupied a position of trust at all; and, if so, (2) whether the defendant used that position of trust to facilitate or conceal the offense.[2]  151 F.3d 29, 31 (1st Cir. 1998);

---

[2] There is no evidence that Mr. Marles attempted to conceal the offense.  Presumably, he thought MBNA would not track his actions, but he did not use someone else's access code, attempt to erase the computer entries, or otherwise try to hide his actions.

*United States v. Gill,* 99 F.3d 484, 489 (1st Cir. 1996); *United States v. Santiago-Gonzalez,* 66 F.3d 3, 8 (1st Cir. 1995).

The hallmark of a position of trust under § 3B1.3 is "'professional or managerial discretion.'" *United States v. Chanthaseng,* 274 F. 3d 586, 589 (1st Cir. 2001) (quoting *United States v. O'Connell,* 252 F.3d 524, 528 (1st Cir. 2001)); *Reccko,* 151 F.3d at 31 (quoting U.S.S.G. § 3B1.3). Section 3B1.3 requires that the position be one involving "substantial discretionary judgment that is ordinarily given considerable deference." U.S.S.G. § 3B1.3, cmt. n.1. In *Reccko,* the First Circuit explained that employees in positions of "discernable discretion" are typified by "significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." 151 F.3d at 31. Professional or managerial discretion is "paramount." *Chanthaseng,* 274 F.3d at 589.

Despite his title and loan authority, Mr. Marles' discretion was tightly circumscribed by MBNA's policies and procedures and when he exercised it, his judgment was given little, if any, deference. *See United States v. Davuluri,* 239 F.3d 902, 908 (7th Cir. 2001) ("The sentencing court must look beyond formal labels to the relationship between the victim and the defendant and the responsibility entrusted by the victim to the defendant."). His immediate manager positioned him directly outside his office so that he could listen to his telephone calls and conversations; MBNA management could and did monitor his calls by listening in and taping them for group review; management performed periodic random reviews of between 5% to 10 % of his decisions; MBNA's computer program allowed intensive quantitative and qualitative monitoring of his work down to the second; MBNA management had the authority to and did countermand his loan decisions; and, its security program tracked his use of the computer and

14

flagged any improper use.[3]  Although not inconceivable, it would be rare that employees with the type of professional or managerial discretion contemplated by § 3B1.3 would be questioned and written up for taking an eight-minute break in the middle of the day to go to the café to get a sandwich.

Mr. Marles did not enjoy the accoutrements of professional and managerial discretion. Although he had worked as an assistant manager in the past, when he committed the offense, he was not considered a professional or managerial employee for wage and hour purposes and he was not assigned to supervise, train, or manage any other employees.  To the contrary, during the year leading up to his offense, his personnel file reflects that he had been under particularly rigorous managerial scrutiny.  In the spring of 2004, he had been the subject of numerous write-ups and MBNA had issued him a Final Warning for conduct.  On September 21, 2004, his supervisor warned him that he "may find himself removed from the department based on the decisions he is making."

In virtually every case involving fraud, someone takes unfair advantage of someone else, often breaching the trust the victim placed in the perpetrator, and this is invariably true when an employee steals from an employer.  *See United States v. Edwards,* 325 F.3d 1184, 1187 (10th Cir. 2003) (quoting *United States v. Koehn,* 74 F.3d 199, 201 (10th Cir. 1996)) ("in every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud").  Fundamental to the employment relationship, it would seem, is that the employer trusts its employee not to steal its assets and the law provides that whether the defendant occupied a position of trust should be

---

[3] It is not clear after *Reckko* how this Court should consider the fact that MBNA monitored Mr. Marles' calls.  In *Reckko,* discussing the fact that the defendant's use of the telephone was monitored, the First Circuit noted that the 1993 change in § 3B1.3 made inapplicable the paradigm of "wrongs that defy facile detection."  151 F.3d at 33. But, even if the Guideline now emphasizes managerial or professional discretion, the fact that an employer listens in on and tapes an employee's telephone calls is some evidence that the employee does not occupy a position of trust.

viewed from the perspective of the victim. *United States v. Bollin,* 264 F.3d 391, 415 (4th Cir. 2001), *cert. denied Gormley v. United States*, 535 U.S. 989 (2002); *United States v. Hussey,* 254 F.3d 428, 431 (2d Cir. 2001) (per curiam).  But, a breach of trust alone is not sufficient for a § 3B1.3 enhancement and the victim's view of whether the employee occupied a position of trust cannot trump the Guideline requirements.  For example, banks have a right to expect honesty from each employee, its tellers no less than its president, but tellers are not subject to the enhancement.  Under § 3B1.3, for an employee to be subject to the enhancement, the employer must repose in that person the authority to exercise professional or managerial discretion.

The other cases cited by the parties offer some assistance, but are not determinative.  This is because in performing § 3B1.3's "two-level review," the critical assessments are often "fact bound." *United States v. Flecha-Maldonado,* 373 F.3d 170, 180 (1st Cir. 2004); *United States v. Morris,* 286 F.3d 1291, 1296-97 (11th Cir. 2002) (noting that the applicability of "the enhancement is highly dependent on the specific facts in each situation").  In many respects, the Sharon Lee case, where the § 3B1.3 enhancement was not imposed, is similar to Mr. Marles' case.  Like Mr. Marles, she worked at MBNA, accessed accounts, altered information, and embezzled money; however, unlike Mr. Marles, she was employed at an entry-level position – customer marketing advisor – and she did not have the authority to extend credit or increase credit lines. *See Lee,* 324 F. Supp. 2d at 166-67.  This Court has available only transcripts of the sentencing hearings for Messrs. Holland and Price and it is difficult to discern the factors that led Judge Sleet not to impose the enhancement and Chief Judge Singal to impose it.  In the end, it appears that the differing resolutions of these cases were bottomed on their differing facts.

The Government cites *United States v. Fox,* 999 F.2d 483, 486-87 (10th Cir. 1993), where a § 3B1.3 enhancement was upheld for a credit card company employee, who began to

embezzle money in her entry-level position.[4]  However, the Tenth Circuit found significant the fact that Ms. Fox had later been promoted to a managerial position and used that position to alter the delinquent status of the account to remove the flag code that would have shown the arrearage.  *Id.* at 484, 487.  It also cites *United States v. Magnuson,* No. 96-4957, 1997 WL 414668 (4th Cir. July 24, 1997) (per curiam) (unpublished opinion).  In *Magnuson,* a fired computer analyst used his home computer and password to enter his former employer's computer network and wreak havoc, disabling its computer servers in seven states and causing 112 hours of work by its employees.  *Id.* at *1.  The Fourth Circuit upheld an abuse of trust enhancement in part on the district court's finding that the defendant had been given a special password which permitted broad access to his employer's entire computer system, access not available to all users of the system.  *Id. Magnuson* has limited applicability to this case.

Similarly, this Court does not consider cases involving bank loan officers to be determinative.  *See United States v. Stringham,* 133 Fed. Appx. 529 (10th Cir. 2005), *cert. denied* 126 S. Ct. 590 (2005); *United States v. McMillen,* 917 F.2d 773 (3d Cir. 1990); *United States v. Ehrlich,* 902 F.2d 327 (5th Cir. 1990).  The evidence at the sentencing hearing demonstrates that bank loan officers are not the same as credit analysts.  Although aspects of their positions may coincide, there are crucial differences between a traditional bank and a credit card company in the way they extend loans that result in different controls on their range of discretion.

---

[4] The Defendant correctly points out that the First Circuit has cautioned against reliance on case law based on the version of the Commentary to § 3B1.3 that existed prior to November 1, 1993.  *Reccko,* 151 F.3d at 33.  On November 1, 1993, the Sentencing Commission amended its Commentary to § 3B1.3 to emphasize professional or managerial discretion.  The earlier version simply read:  "The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons.  This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller."  This language was deleted and replaced "to better distinguish cases warranting this enhancement."  *See* U.S.S.G. Appendix C, am. 492 (eff. November 1, 1993).

Here, MBNA trusted Mr. Marles only so far and not very far at that – placing him within earshot of his supervisor and under the ubiquitous and vigilant electronic gaze of its computer system. Based on this record, this Court cannot conclude that the Government has sustained its burden to demonstrate that this Defendant abused a position of trust under U.S.S.G. § 3B1.3.

### C.  Use of a Special Skill

A more difficult question is presented by the use of a special skill enhancement. A "special skill" as described in § 3B1.3 is an expertise not possessed by members of the general public, usually requiring substantial education, training, or licensing. U.S.S.G. § 3B1.3, cmt. n.3. Examples include "pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.*; *United States v. Prochner,* 417 F.3d 54, 60 (1st Cir. 2005); *United States v. Nelson-Rodriguez,* 319 F.3d 12, 57 (1st Cir. 2003). However, a defendant need not necessarily have formal education or training to possess a special skill. *Procher,* 417 F.3d at 61 (self-taught computer hacker); *United States v. Montero-Montero,* 370 F.3d 121, 123 (1st Cir. 2004) (boat piloting and navigation); *Nelson-Rodriguez,* 319 F.3d at 58 (use of a 20/40 radio); *United States v. Noah,* 130 F.3d 490, 500 (1st Cir. 1997) (self-taught professional tax preparer).

In *Prochner,* the First Circuit pointed out that some circuits have "gone quite far in insisting, as a *sine qua non*, upon an extensive amount of formal education, training and licensing." 417 F.3d at 62. But, the First Circuit has not gone that far. *Id.* The First Circuit test is whether the "record supports a finding of a skill of sufficient kind and scope at a level well beyond that of a member of the general public." *Id. Prochner* also quoted *Noah*: "The critical question is 'whether the defendant's skill set elevates him to a level of knowledge and proficiency that eclipses that possessed by the general public.'" *Id.* at 61 (quoting *Noah,* 130 F.3d at 500).

Applying this standard narrowly, it is true that a member of the general public would not know how to access MBNA's accounts or alter credit limits. But, as this Court pointed out in *Lee,* this same point could be made for bank tellers. 324 F. Supp. 2d at 168. Unlike bank tellers, most members of the general public would not know how to operate a bank's computer system, access customer banking accounts, and properly credit and debit entries. Yet, the Guidelines expressly eliminate bank tellers from § 3B1.3 enhancements for a violation of a position of trust. Having expressly eliminated bank tellers from the two-level enhancement for abuse of a position of trust, it would be at best incongruous for the same Guideline provision to enhance their sentences for use of a special skill. *Id.* Further, in view of the highly computerized nature of MBNA's business, if the standard for a special skill enhancement were solely whether its employee could access customer accounts and adjust credit limits, a significant number of its employees, if convicted of a similar crime, would be subject to a § 3B1.3 enhancement.[5] This would extend the reach of § 3B1.3, due more to the sophisticated nature of the tools of the credit card trade than to anything intrinsic about the nature of the employee's job.

This Court reads *Prochner* in the context of the Commentary that limits application of the use of a special skill enhancement to people like "pilots, lawyers, doctors, accountants, chemists, and demolition experts." Carefully using language such as "skill . . . *well beyond* that of a member of the general public" and a level of skill that "*elevates* him to a level of *knowledge and proficiency* that *eclipses* that possessed by the general public," *Prochner* avoided adopting a standard that was either generally applicable to many employees or inapplicable to all but the most rarefied professionals. 417 F.3d at 61-62 (emphasis supplied).

A related question is what set of skills Mr. Marles actually used to perpetrate his offense. A person may be highly skilled, but the enhancement is not applicable unless he uses those skills

---

[5] One MBNA witness estimated that out of its 27,000 employees, 1,000 are credit analysts.

to commit the crime. *See United States v. Weinstock,* 153 F.3d 272, 281 (6th Cir. 1998) ("Weinstock's status as a podiatrist, standing alone, does not automatically mean that he used his medical skills to facilitate the crime."); *Noah,* 130 F.3d at 501 (finding that "the appellant had a special skill and used it to perpetrate the offenses of conviction"); *United States v. Gandy,* 36 F.3d 912, 915 (10th Cir. 1994) ("the mere fact that a defendant possesses a special skill is not enough to warrant his sentence being enhanced"); *United States v. Garfinkel,* 29 F.3d 1253, 1261 (8th Cir. 1994) (Defendant, a psychiatrist, did not use his special skills to commit the offense and therefore the § 3B1.3 special skills enhancement was inapplicable).

Here, even though Mr. Marles was denominated a Senior Credit Analyst, there is little evidence that his crime was a function of his level of seniority. Mr. Marles gained access to his and his wife's MBNA accounts with his User ID. It appears that MBNA assigns a User ID to every MBNA employee who uses a computer, regardless of classification and, therefore, his ability simply to access these accounts is not persuasive evidence of his use of a special skill. The ability to alter the credit limits is more so. To alter a credit limit, an MBNA employee must have loan authority and a lender code and Mr. Marles received these shortly after he became a member of the credit division.[6] At that point, as a Credit Analyst II with a lending limit of $5,500.00, he could have perpetrated this same crime, even authorizing the credit extension of $28,700.00.[7] Because he could have perpetrated this crime in exactly the same fashion before he was promoted, the attributes of his higher position of Senior Credit Analyst are something of a

---

[6] MBNA approved Mr. Marles' lending authority of $5,500.00 on January 26, 1998.

[7] An individual credit analyst's lending limit is not a ceiling, but more like a guideline. Janet Running, a former MBNA executive, testified that if the application evidenced appropriate demographics and FICO score, a credit analyst with only a $5,500 lending authority could approve a $30,000.00 credit limit. In fact, in this case, Mr. Marles extended his own credit by $25,700.00, $700.00 more than his lending limit. MBNA did not catch Mr. Marles because he extended credit; it caught him because he entered his own and his wife's accounts and made alterations. His personnel record states: "Account . . . listed to Brian and Bethany Marles had incurred an unusual credit line increase, from 19,300 to $45,000. *This line change had flagged on a report monitored by Audit. This report identifies when MBNA employees make alterations or changes to their own accounts.*"  (emphasis supplied).

red herring for purposes of the special skill enhancement.[8]  Even though through training and experience, Mr. Marles was capable of assessing credit risks, he obviously did not put those skills to use in determining and altering his own and his wife's credit limits.

It is true that through training and experience, Mr. Marles was allowed to gain lending authority and to make credit alterations in the first place.  But, there is no evidence that he called on any of this training and experience to perpetrate the crime.  *See Weinstock,* 153 F.3d at 281 ("While admitting that being a podiatrist gave him the opportunity to submit false bills, Weinstock argues that his podiatric skill did not facilitate the crime within the meaning of the sentencing guidelines.").  Rather, when he applied his User ID and lender code to his own and his wife's accounts, he blithely assumed that he would not be caught.[9]  On this narrow question – whether the mechanics of the crime amount to the use of a special skill - there is extremely limited evidence.[10]  But, this Court cannot conclude based on the evidence in this record that Mr. Marles actually used his higher training and experience as a Senior Credit Analyst to perpetrate this crime.  Instead, he used relatively unsophisticated skills – the use of a computer password and the ability to make a mechanical change on a credit limit – to commit this offense and his failure to use more sophisticated means may explain why he was so easily and quickly caught.

This Court cannot conclude that Mr. Marles either possessed a special skill or used it within the meaning of U.S.S.G. § 3B1.3 to perpetrate this offense.

## III. Conclusion

---

[8] There is no evidence that Mr. Marles used his additional experience or status as a Senior Credit Analyst in connection with the commission of this offense.

[9] The personnel file contains a summary of an in-house interview with Mr. Marles.  He states that he did not alter the credit limits because they were in financial difficulty, but only to obtain the more favorable MBNA interest rates. Mr. Marles is quoted as saying candidly, "I thought I could get away with it."

[10] Evidence that the entire transaction can be performed within 45 seconds to 1 minute for a queue application is some evidence that the alteration of the credit limit itself is neither onerous nor complex.

In *Reccko,* Judge Selya wrote that "the guidelines sometimes define terms in ways that might strike lay persons as peculiar."  151 F.3d at 31.  From a lay perspective, in committing this offense, Mr. Marles was disloyal and manipulative and MBNA has the perfect right to view his actions as a violation of its trust and the misapplication of skills it taught and entrusted to him. But, the United States Sentencing Commission defines abuse of trust and use of special skill in specific ways and this Court concludes that the Government failed to sustain its burden to demonstrate that the Defendant abused a position of trust or used a special skill within the meaning of U.S.S.G. § 3B1.3.  It declines to impose a § 3B1.3 two-level enhancement to the Defendant's offense level.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of January, 2006